# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| WERTHEIMER H., INC.; WERTHEIMER A., INC.; HENRY WERTHEIMER, III; JANE WERTHEIMER; PAUL WERTHEIMER; and JANET WERTHEIMER, <br><br> Plaintiffs, <br><br> vs. <br><br> RIDLEY USA, INC., a Minnesota Corporation, d/b/a WESTFEEDS; and JOHN DOES I-IV, <br><br> Defendants. | CV-18-83-GF-BMM <br><br> ORDER ON MOTION FOR SANCTIONS |

## INTRODUCTION

Defendants Ridley USA, Inc., a Minnesota Corporation, d/b/a Westfeeds ("Westfeeds") have filed a motion for sanctions based on alleged spoliation of evidence. (Doc. 28.) Plaintiffs Wertheimer H. Inc., Wertheimer A., Inc., Henry Wertheimer, III, Jane Wertheimer, Paul Wertheimer, and Janet Wertheimer (collectively the "Wertheimers"), oppose the motion. (Doc. 38.)

1

# DISCUSSION

Westfeeds seeks sanctions against the Wertheimers for alleged spoliation of evidence. Westfeeds identifies four pieces of evidence that it alleges that the Wertheimers failed to preserve: 1) the Rumensin 90 bag; 2) the note in which Westfeeds's store manager Dale Berg calculated the amount of Amprovine that the Wertheimers would need; 3) the surviving calves; and 4) the carcasses of the dead calves. (Doc. 29 at 10.)

## A. Rumensin Bags.

Westfeeds contends that the Wertheimers should have preserved the brown bag in which they claim that Westfeeds provided the Rumensin 90 to Jane Wertheimer on January 3, 2018. Westfeeds points out that the Wertheimers knew that litigation was reasonably foreseeable within hours of Jane's purchase of the Rumensin. The Wertheimers claim to have burned the brown bag in their burn barrel moments after dumping the Rumensin 90 into the grinder mixer. Westfeeds counters that the Wertheimers' veterinarian, Dr. Lance Hughes, testified that he saw remnants of the burned bag in the barrel on January 4, 2018.

An imposition of sanctions proves unwarranted here. As noted in the Court's order on Westfeeds's Motion in Limine, the Wertheimers claimed that they burned the bag immediately after dumping out its contents in the ordinary course of their

2

business. (Doc. 42 at 3.) No problems had developed with their cattle at the time that they burned the bag in the ordinary course of their business and thus they had no legal duty to preserve it. (*Id.*)

Wertheimers concede that Bob, Paul, and Janet Wertheimer admitted in their depositions either that they did not see the bag or did not pay attention to it. *Id.* at 4. Westfeeds can use these concessions to attempt to impeach the testimony of any of these potential witnesses in the event that they testify differently at trial. Wertheimers further assert that only Dr. Lance Hughes would testify affirmatively about the absence of a label. *Id.* Hughes testified in his deposition that he saw the plain brown bag in the burn barrel at the Wertheimers' ranch after Janet Wertheimer told him that the bag lacked any writing. It remains for the jury to decide what weight to attach to the testimony of the Wertheimers and Hughes regarding the question of whether Westfeeds attached a label to the bag. The apparent inadvertent destruction of the Rumension 90 bag has not undermined the "search for the truth" of what happened on January 3, 2018. *Spotted Horse v. BNSF R.R. Co.*, 350 P.3d 52, 58 (Mont. 2015), *quoting Oliver v. Stimson Lumber Co.*, 993 P.2d 11, 17 (Mont. 1999). The Court denies this motion.

## B. Dale Berg's Note.

The parties agree that Berg wrote out a note for Jane Wertheimer on which he calculated the appropriate dosage of Amprovine, an alternative to Rumensin, that Wertheimers would need for a herd of their size. (Doc. 29 at 3.) Westfeeds contends that this note would have demonstrated that the Wertheimers had ignored its advice. (Doc. 29 at 3.) Wertheimers suggest that the loss of the note hurts its case as the note would have evidenced Westfeeds's counsel of dosages for the potential substitute Amprovine and for the Rumensin 1200 that the Wertheimers purchased from the store in Great Falls, but not for the allegedly unmarked Runension 90 that Wertheimers purchased from the store in Lewistown. (Doc. 38 at 20.)

Both sides seem to concede that (1) Jane Wertheimer spoke with Berg regarding the problem with the cattle, (2) Berg suggested using Amprovine instead of Rumensin, (3) Berg suggested how much Amprovine the Wertheimers would need, and (4) the cost of the substitute. The Court agrees with the Wertheimers that the parties do not dispute the pertinent points covered by the note. The Court does not deem the note critical to "a fair and accurate description" of the conversation between Jane Wertheimer and Berg. *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137, 1142 (D. Mont. 2009). The Court denies the motion.

### C. Failure to Provide Access to the Surviving Calves and to Preserve Dead Carcasses

Westfeeds argues that the Wertheimers sold the surviving calves, knowing that litigation would occur, without first allowing Westfeeds the chance to have its expert examine them. Further, Westfeeds alleges that the Wertheimers failed to preserve the cattle carcasses.

The following represents a timeline of correspondence between the parties from the time that Westfeeds's counsel first asked to inspect the remaining live cattle and cattle carcasses until the time that Westfeeds's counsel visited Wertheimer ranch.

| Date | Event | Citation |
|---|---|---|
| 02/01/2018 | Westfeeds's counsel calls Plaintiffs' counsel and requests an inspection of live and dead cattle. Plaintiffs' counsel indicates possibility of a 2/9/18 inspection | Doc. 29-12, p. 2 |
| 02/02/2018 | "I understand from our conversation that you will not be able to address our request with your client until Wednesday, February 7, 2018, and that you anticipate contacting me on February 8, 2018, to discuss an inspection time. You indicated it is possible we might conduct the inspection next Friday, February 9, 2018. As we discussed, I am concerned that we may not be able to obtain usable tissue samples from the dead cattle if we are not allowed to collect the samples in a timely manner after the deaths. I know you appreciate the concern as you indicated you would work to see if you can | Doc. 29-12, p. 2 |

5

| | | |
|---|---|---|
| | make arrangements for us to do the inspection earlier next week." | |
| 02/02/2018 | Email from Plaintiffs' Counsel to Defense Counsel: "As we discussed, we will try to get authority [for an inspection] before Wednesday. Please provide me with a protocol for the testing you would like done, what type of testing will be done, and who is going to do the testing. If I can get these questions answered it will help move this forward." | Ex. 25, p. 3 |
| 02/06/2018 | Email from Plaintiffs' Counsel to Defense Counsel: "Roger Frickle and I are scheduled to go up to Utica tomorrow. If the weather remains anything like this, we ain't. I need to understand exactly what it is that you wish to inspect, and what, if any, testing of what and by whom and what protocols to be followed and how your carrier/representatives/ experts intend to accomplish such." | Ex. 25, p. 2 |
| 02/06/2018 | Email from Defense counsel to Plaintiffs' counsel: "I'm still working on gathering facts myself, but I anticipate being able to send you a letter outlining our request for inspection/testing by the end of the day [February 7]. Part of what we'll want to do is to get a count on the dead and document what we can with photographs. If Wertheimer's claim the live cattle are sick or damaged, we'll want to see those too." | Ex. 25, p. 2 |
| 02/14/2018 | Westfeeds's counsel provides inspection protocol: "We would like to conduct the inspection as follows: 1. document and photograph the remains of the cattle that allegedly died of Rumensin toxicity and attempt to assess the number of cattle lost; … 3. View, document, and photograph the live cattle …. Dr. Sager anticipates observing and evaluating the cattle for BCS (body condition score), age, and other health issues such as parasitism, coccidiosis and other immune deficient concerns. If there is evidence of parasitism or evidence of coccidiosis, Dr. Sager | Doc. 29-13 |

| | | |
|---|---|---|
| | would collect fecal samples to send to the MSU Diagnostic Laboratory for analysis; 4. Collect blood and liver samples … from any cattle that have allegedly died of Rumensin toxicity within 72 hours of the visit." | |
| 2/14/2018 | "I will get about finding a time frame that will work … and then directly furnish you that set of dates so that you have ample time to arrange and gather your group for a field trip to Utica!" | Doc. 38-15, p. 1 |
| 02/27/2018 | Westfeeds counsel: "I'm checking in on the status of the request for inspection in Wertheimer. I know the weather is terrible in that area right now, but it will likely take some lead time to coordinate everyone's schedules, so may it will be [sic] improved by the time we make it out there." | Doc. 38-15, p. 1 |
| 03/06/2018 | "This letter is in follow-up to my letters of February 2nd and 14th in which we seek permission to inspect the cattle loss at the Wertheimer Ranch. We are requesting that your clients preserve any and all evidence related to the loss." | Doc. 29-14 |
| 03/13/2018 | "[W]e learned late last Friday, March, 9, 2018, that the remaining live cattle were sold and would be transported early Saturday morning, March 10, 2018 to a feedlot in Torrington, Wyoming. We understand that your retained bovine expert, Robert Sager, DVM, may want to view, document, and photograph the live cattle. If that is still the case, please contact us so that arrangements can be made to accomplish that. . . . Recognizing that we have only a temporary break in the weather, once the weather does clear, we will make arrangement for your inspection and viewing of the 'dead pile'." | Doc. 29-15, p. 2 |
| 03/16/2018 | "I requested to see the cattle when seeing them would help us evaluate your clients' potential claim. As I expect you know, there's likely little we could now gather from inspecting the live cattle on a feedlot in Wyoming, even if that were possible, | Doc. 29-16, pp. 2-3 |

| | | |
|---|---|---|
| | which seems unlikely. If I'm mistaken, please tell me what arrangements have been made that would allow us to inspect the live cattle at the feedlot."<br><br>"Concerning my continued request to visit the Wertheimer Ranch … please contact me with a specific set of dates that I may consider with the folks that I need to bring with me to conduct that inspection." | |
| 04/12/2018 | "Regarding inspection of the ranch: you will well recall that Weather [sic] was a significant issue during February and early March and the Werthiemer Ranch was often snowed completely in. … We believe, as does Lance V. Hughes, DVM … that your team of experts' examination of the survivors will yield the very same information whether at the Ranch in Utica or in Torrington. And that 'information' in a word, is 'nothing'. … You can call Roger at the office to make arrangements now that the weather has (from time to time) broken and he will coordinate with you … an 'inspection' of the Wertheimer operation, and if your experts thing they can learn anything from looking at the survivors, we can make arrangements for you to view them in Torrington" | Doc. 29-16, pp. 4-6 |
| 05/09/2018 | "Walter & Roger from Cliff Edwards Law came up & I showed them where calves are buried then they met with Jill Gerdrum & their people to show them feed system & burial site" | Doc. 31, p. 4 |

The Court remains reluctant to impose a sanction at this time based on a review of these correspondences. On the one hand, portions of this correspondence weigh in favor of a sanction. For example, counsel for the Wertheimers told

8

counsel for Westfeeds on February 14, 2018 that they would provide counsel for Westfeeds with a date to visit the ranch. Counsel for the Wertheimers did not again contact counsel for Westfeeds until a month later, according to the available correspondences, despite at least one attempt by Westfeeds to follow up about a date. Counsel for the Wertheimers informed Westfeeds' counsel at that time that the Wertheimers had sold the remaining live cattle.

But at the same time, certain facts weigh against a sanction. The parties appear to be cordially communicating with each other to coordinate a visit to the Wertheimers' ranch. The Court further understands that much of this correspondence took place during a time of great upheaval at the ranch as the Wertheimers scrambled to address its coccidiosis outbreak and the alleged Rumensin overdose. Further, counsel for the Wertheimers continued to offer Westfeeds an opportunity to examine the remaining live cattle even after they had been sold.

The parties each have their own gloss on the events that transpired during this "fog of war." The parties each will have an opportunity to present their side of the story to a jury. Much of what the parties disagree about as it relates to the carcasses and remaining live cattle stands central to the Wertheimers' claim for damages. Westfeeds will have ample opportunity to attack any attempt by

9

Wertheimers to prove damages as it relates to the dead carcasses and remaining live cattle, even in the absence of a sanction. The jury can decide which version of events proves more compelling.

That said, the Court will make a final determination on any sanctions regarding the failure of the Wertheimers to make the live cattle available for inspection and to preserve the carcasses of the dead cattle closer to trial, or even after the Wertheimers have had a chance to present their evidence to the jury. The Court will be better able to determine what sanction, if any, would be appropriate at that time having had the benefit of hearing the scope and nature of the damages the Wertheimers attempt to prove at trial. The Court would consider a variety of sanctions including potentially issuing an adverse jury instruction, limiting damages available to the Wertheimers, or, if necessary, a ruling against the Wertheimers regarding liability.

## ORDER

Accordingly**, IT IS ORDERED**, that Defendants Ridley USA, Inc., a Minnesota Corporation, d/b/a Westfeeds Motion for Sanctions (Doc. 28) is **DENIED**, without prejudice. The Court will consider any motion for sanctions as it relates to the remaining live cattle and cattle carcasses at the time of trial, if

Defendants choose to seek sanctions at that time. Both parties stipulated motions (Docs. 65 and 66) are **DENIED**, as moot.

DATED this 3rd day of March, 2019.

_____
Brian Morris
United States District Court Judge